is case number 419-0316, The People of the State of Illinois v. David Dunmire. For the appellant, we have Mr. Williams, and for the accolade, we have Mr. Goble. You may proceed, counsel. Counsel, I'm going to ask you to speak up just a little bit. Yeah, I think we're all going to have to wait a little bit. I'm going to ask you to speak up just a little bit. Yeah, I think we're all going to have to wait a little bit. Yeah, I think to have to wait a little bit. Yeah, I think we're all going to have to wait a little bit. What level of training is required to enable an officer to know whether or not he or she can see through a window? And here, it's the officer had actually recently completed a day of training on window tent at the police academy. And the state prospectively submits that that's more than adequate training for the officer to be able to know whether he can see into a window. Again, I don't mean to oversimplify this, but it's not rocket science. We're talking about whether or not you can see through a window. Well, counsel, would it matter if the officer had not had this training? I mean, it seems to me the state's position is that if the officer can't see through the window, that's enough. Yeah, that is the state's position. And I guess I would frame that in the sense that it just I feel like it just bolsters our argument. Frankly, it's not often that you happen to have an officer who, what I believe is the last year, because we're dealing with a new officer here. So he had pretty recently actually had this training. I don't mean to suggest that, you know, veteran officers out on the street that have been doing this for 40 years need to go through a day of training. Again, we're talking, I really don't mean to oversimplify it, but we're talking about Simple can be a good thing, so don't apologize. The question is, can you see through the window? I mean, that's what we're talking about today. And I just I. The state rejects any suggestion that this is somehow complicated that requires some particular amount of training. The question is, can you see the window here? It's undisputed in this case. It's never been disputed. Well, basically, we're essentially living in a world where we agree that the window was illegal. It's never been disputed that the officer couldn't see in there. Never been disputed that was in fact illegal. The question is just whether or not the officer had the app for training to be able to know whether he could see inside the window. What about this issue of whether or not the officer understood the law and how to apply it in this particular circumstance? How's that play out? Well, actually, that's my very next point. Here, the defendant just pointed out in this briefing that when counsel did a very good job with crossings innovation and basically struck the officer up. So the officer basically explained the standard correctly. Counsel presses him on the issue and gets the officer to. What happens really is that the officer explains the standard in reverse. That 30 percent light transmittance means 70 percent of light can pass through. It actually means 30 percent can transmit through. The statute is not the most real statute. I don't recommend it, frankly. But again, it should be pointed out. The officer explained the standard. He explained the basic law correctly. And he even given a very specific example explaining that the lower the percentage, the lower the light amount of light can pass through. Using five percent as an example. That's one of the examples of the limo test as explaining that only five percent of light can get through. So it seems that the officer understood the law, just kind of got tripped up in his testimony. But any of it, I don't think that an officer's misstatement at a very particular point in time in his testimony would render his suspicion to feel unreasonable. Especially where it's here. We're talking about the undisputed fact that the officer could not see inside the window. So that's what the law, I don't want to repeat myself, but that's what the law is intended to do. To that end, there's a couple of points that I'd like to briefly address. So throughout the briefing, the defendant essentially baselessly asserts that 30 percent is very dark. But that's just simply not true from my experience. I can tell you that. But moreover, again, repeating myself, but the law is intended to ensure that officers can see inside the vehicle. I just don't think that describing 30 percent of light transfer is very dark is at all accurate. The defendant also points out that the statute doesn't require the officer to be able to see inside the vehicle, which is true. It doesn't require that, but that is, of course, the explicit purpose of the statute. So, I mean, to me that's just faulty logic. I mean, it's like the DUI statute, for example, doesn't require that people are called out drunk to arrest them on suspicion of DUI. But, of course, if a person is unable to state it up, for example, it's perfectly reasonable for an officer to assume or to suspect that that person may be of influence. The defendant also points out that there's no Illinois case addressing exactly how much weather-tested training this requires for an officer to be able to reliably know if he can see inside the vehicle. Again, that's true with the state respectfully submits that the data training the officer had here certainly is more than sufficient for him to know whether he can see inside the vehicle. But based on this lack of cases, which although it does appear to me as well that there is quite a lack of cases. You see quite a few cases back in the early 90s and not much in the cases in recent years. But based on the lack of cases, the defendant relies on a couple of out-of-state cases that really have no applicability here. In Conway, for example, there the officer testified only that the car appeared to have dark window tint. So the problem in that case was the lack of particular facts in support of the officer's suspicion. Whereas here, we have officers at various times repeatedly testifying as to his complete inability to see into the vehicle, which is the basis of his suspicion. And then in Williams and Buffalo, there the state, in both of those cases, the state advocated a pretty sweeping position that the court easily rejected that would have allowed officers to just stop anybody that has a window tint, regardless of the defendant's suspicion. So of course, the courts had no trouble disposing of such an argument. But again, those cases, maybe there's a lie or two that maybe looks favorable here. But I mean, ultimately, when we look at the holdings of those cases and the reasons for them, they really, I don't think, have very much persuasive value here for this court. Ultimately, again, I would just repeat, Illinois enacted this law to ensure that officers could see inside the car. The officer here could see inside the car. That undisputed fact provides a reasonable suspicion of a window tint violation. Again, reasonable suspicion is a very low standard. It doesn't require that much because we're talking about a very brief seizure in most cases, in a lot of cases, unless this court has any further questions. I have one other question. There's also this argument by the defense that the officer and the court seemed to latch on to this, that the officer didn't have a way to confirm that the tint was too dark. That they didn't have, I think they referred to it, I can't remember the name of the device, but some type of device that would confirm. Right. What about that? I mean, where does the officer go from, okay, well, I can't see through the window, but I don't have a way to confirm that the tint is too dark. Is that the route we should go, or how does that work? Okay, so I guess first of all, so the court, that argument wasn't even argued below by counsel. And then kind of out of left field, if you will, the court, that's what the court latched on to. In essence, what the court found was that unless you're able to immediately confirm your suspicion through technological assistance, then that suspicion is not reasonable. Now, the state can't deny that technology makes proving things a lot easier, but that's not at all to suggest that in the absence of that technology, that an officer's suspicion is reasonable. I mean, I would note that we're dealing with a very small town here in Los Alamos. You've probably heard of it. It's like a thousand people. I don't feel like it's unreasonable that an officer doesn't, you know, the police department doesn't have a slightly different device. And I think that question is ultimately really not a question of reasonable suspicion, but a question of proof, you know, reasonable doubt, right? The state can suspect that somebody's committed this crime and then it's on the prosecution to prove it. And here we could have proved it. You know, there's any number of things we could have done here had this state insisted on following through with Windows 10 and not, you know, obviously the case here wouldn't have actually been wide. But perhaps the state police could have called it a simple, you know, scan. I'm not really sure how the device works, honestly, but there's meaning to proving this offense up, that we can prove it up in a better way after the fact. I don't really think it should inform the reasonableness of the officer's initial suspicion. Mrs. Gordon, any other questions? I don't see any at this time. Thank you. You'll have additional time on rebuttal if you desire. Mr. Goble? May I please report? Yes, sir. The state, with all due respect, Mr. Woods, has redrafted this statute. The state wants this statute to say that if the window tint is so dark that an officer can't see in, that that is a violation. And that is not at all what the plain language of the statute says. So are we concerning ourselves with whether or not it's a violation or whether or not there's reasonable articulable suspicion that there's a violation? Is there a difference there? Absolutely. We are concerned with whether there is reasonable articulable suspicion to believe that there's a violation. But it's reasonable articulable suspicion to believe that there's a violation of this statute, not the statute that he's written. So he's decided, or the state has decided, that it's a violation that the officer can't see in. And that's nowhere in the statute. Instead, the statute talks about a certain amount of light that passes through a window. And it says nothing about whether we should be able to see inside that vehicle at various lighting conditions that might exist. That's not in there. The state wants to turn this quickly into an officer safety issue. Counsel, let me ask you. So explain to me what it looks like if an officer does have reasonable articulable suspicion to stop someone for suspicion of violating the window tint statute. What does that look like? Perfect. We would have an officer first that knows the law, and I'll get to that in a moment. But assuming that officer knows the law, that officer – because it's not common sense to know what a violation looks like. So that officer would have had some training where vehicles would be lined up with one vehicle at one end that's untinted, and then a vehicle that is moderately tinted, and then a window that is barely legally tinted, and then another window that's illegally tinted, and then another window that's very tinted. And then that officer would train on various lighting conditions – bright light, dusk, darkest of nights – and would know if he can, in fact, make that determination. Because that's what the statute says. So an officer says, okay, here's what the statute requires. Now let's see what that looks like, because this is about training and experience. This isn't common knowledge. We have this assumption that's been thrown out there that it's common knowledge that you can't see inside of a window. He says – page 3 of his reply brief – he says, quote, even when only 30 percent of light can pass through a vehicle's window, the interior of that vehicle is still clearly visible. That's a quote from the brief, and that's nowhere in the statute. It's nowhere in the officer's testimony. There's nowhere in the officer's training and experience. We don't have any appellate courts that say that, and he's thrown that out there as though it's gospel truth, and it's simply not true, because science gets in the way of that. Let me ask this question, counsel. Did the trial court express any doubt about the credibility of Officer Crowder when he testified? He never reached the issue of credibility. Well, isn't that always present in a hearing on a motion to suppress? That is, the first question is, do I believe what this officer said? And then the next question is, what about the rest of them? So that's, I guess, implicit, wouldn't it? I think in a – I'm not sure I like the way Judge Cherry phrased his order. I don't believe Judge Cherry was really creating a confirmable suspicion standard. Well, how about just going back to my question? Is there any indication in this record that Judge Cherry did not believe Officer Crowder? He ruled in my favor. That would be – Counsel, this isn't a tricky question. I mean, yes or no, is there any indication in the record that Judge Cherry did not believe Officer Crowder? He never says that specifically. So I guess that's yes, there's no indication, or what? I don't know how to answer it other than that. The answer is yes. The judge did not specifically rule that Officer Crowder was incredible. He doesn't make that ruling. Okay. Then the next question would be, did Officer Crowder testify about his training and experiences, understanding that, based upon that, he should be able to see inside a vehicle, or at least see the outline of an occupant therein? No, he did not. He never testified to that. He testified that that's what he believed, but he had no training as to – Okay. Did he testify that he believed, based upon his training and experience, he should be able to see inside a vehicle? No, he did not. He testified that he had been trained under bright sunlight, that he had no experience to know if a person should be able to see through a window at night. If our understanding of the record is different, do you lose? Yeah, I was there. So if our understanding of the record is that he testified that he believed, based upon his training and experience, he should be able to see inside a vehicle or at least see a person. But that training and experience has to be based on fact. Well, you see, counsel, that's why I try to ask my questions with precision. I didn't say what it's based on. My first question is, did he testify to it? Then we can get on to the subject of what it's based on. So, well, let me go back again. Did he testify that his understanding of his training and his experience was that he should be able to see inside the vehicle? I don't believe he said that that was based on his training and experience. I don't. I don't. I don't. So this was a standard he created out of whole cloth, had nothing to do with any of his training? Absolutely, Judge. This was, this is not the standard. It is not the standard. Well, I didn't say, I'm just, where did it come from? So if it had nothing to do with his training, is he understood his training? It came from the state's attorney. It had nothing to do with his training, is your position, as he understood the training he received in the center? Correct. Okay, go ahead. I have a question as a follow-up. Justice Feigman was asking about whether or not the court questioned the credibility of the officer. Do you agree that the court seemed to rely on this notion that unless the officer could confirm the violation, that the officer should not have stopped your client? That's what he wrote. I don't. I disagree with the confirmable suspicion standard. Do you disagree that the court used it? That's what the court ruled. I am not suggesting that this court, that this appellate court should affirm based on Judge Cherry's order. Not at all. I ask that question because it would seem to suggest that it wasn't a credibility issue, but just a matter of, well, you couldn't prove that he violated it. It was, the ruling came from left field. It was not anything that I had argued. It was nothing that the state's attorney had argued. I don't know where it came from. I argued, first, that there's nothing in the statute that talks about what you can and can't see. In fact, if, and this is really an important point, when it's pitch black outside, as this officer testified it was, I mean, the state has argued, and they put in their brief, that this was an illuminated road. That's a mischaracterization of the evidence. There was nothing in the record that says this was an illuminated road. There was a single light a good distance away. The officer couldn't specify how far it was, but did say that it wasn't directed towards the vehicle. And near the vehicle, it was pitch black. And I walked into my garage the other day. My son was 12. He was getting a ride to school, and he goes to get in my wife's van. And he's waiting for her in the van. And I'm thinking about this case. My wife asked me if I'll go get something out of her van. I walk out to the garage. I shut the door behind me. I look in my wife's van. I know my son's sitting there, and you can't see him at all. And it's not, there's no, the windows are not tinted at all. But, so, there's a single candle 100 yards away, and that's the only light, and my window is perfectly legal tinted, only blocking 10% of the light. We're not going to be able to see through that window because we can't. There's nothing in the statute that says we should be able to see inside the interior. We're reading things into the statute that aren't, that isn't there, and the officer's not allowed to read things into the statute that aren't, that isn't there. If the officer's trained, but that training says add stuff to the statute that isn't there, it's the appellate court's job to say we don't let officers add things that aren't in the statute. Does the record show that the officer's understanding that he should be able to, if the window were legally tinted, he should be able to see a person inside the vehicle? Yeah, that's what the officer thought. Does the record show that that's an incorrect statement of the law? Yes, it's an incorrect statement of the law. No, no, counsel, see, I ask these questions, I try to be precise. Does the record demonstrate this? Is there some evidence in the record, like if some expert would say, no, you see, that's not the standard and here's how it works. Is there something like that in the record? The officer's testimony on cross-examination. I didn't call an expert witness, no. No, he said the gist of it seems to be, based upon his training and experience, I should be able to see someone inside the vehicle. Your position is that's not a correct statement of the standard. And my question is, what evidence is there in this record to demonstrate that the officer's statement was wrong? Well, first of all, the officer was wrong about what the statute says. See, counsel, again, I'm trying to phrase my questions with precision. What evidence is there in the record to show that the officer's statement was wrong legally? Well, I hate to throw a question back, but what evidence is there that the officer's standard is accurate? You don't hate to throw a question back. I'm sorry. Well, I'm... It's the state's, the state has to have... Well, here, let me put it this way. A fundamental point that you've argued to us now a couple of times is the officer's wrong. And maybe you're right, but I'm thinking, what evidence do we have to be able to reach that conclusion, that the officer's wrong? It's the state's burden to have the reasonable suspicion, not my job to dispel... Well, leaving aside burdens for the moment, just as a matter of, I don't know about window tinting, okay? You're saying, the officer says, I should be able to see someone inside the car. You're saying that's the wrong standard. Maybe you're right, but what is the evidence in this record to demonstrate that the officer's wrong? That's the fatal flaw in the state's case, is there is no evidence that the officer was right. Might the officer have been right? If the officer had been properly trained, the officer could have... Remember that line of cars that I had put up? The officer could come up and he could say to the judge at the hearing, Judge, sometimes I'm wrong. Sometimes when I'm looking at a legally tinted window, from my vantage point in these lighting conditions, I think it's illegal, and it turns out I'm wrong. But I was trained, and I'm close, I'm usually right. It's no different than those cases where an officer comes on a traffic stop and he sees the guy with the one-hitter box in his pocket. And the officer's been trained to know what one-hitter boxes look like. And 24 out of 24 times he's dealt with one-hitter boxes. He opens them up, and there's cannabis inside. And so if my wife sees a one-hitter box, she's never seen one before, she has no idea what it is, but an officer that's properly trained and has the proper experience can look at that one-hitter box, and he's got reasonable suspicion to believe that it's cannabis, just like an officer that's properly trained can look at that window tinting in the dark and say, based on my training and experience, I believe that that's an illegally tinted window, whereas someone else like me or this particular officer who has no training to know what a lawfully tinted window looks like at night would look at that window and say, I have no idea. But counsel, the problem is we have the officer's testimony. And you're absolutely right. It's the state's burden to prove that the officer had a reasonable articulable suspicion. But we have nothing rebutting that, nothing challenging that, such as another officer who might be called in to say, actually, the training goes this way, like what you described, in that if you see it at night, then you have to be cognizant of whatever. I mean, someone to testify. Just like think about at the trial court level with DUIs. You might have an officer come in, testify for the defense. Well, this is actually how you do the field sobriety test, and this officer did it wrong. But we don't have that here. And we don't have anything suggesting why it's not appropriate to rely on what the officer testified to. I disagree. Imagine in that scenario that an officer takes the stand and says, I have no training on the horizontal gaze nystagmus. I haven't seen horizontal gaze nystagmus, but I have heard about it. Is that our case, though? Because this officer has training. I know you're focusing on at night, but this officer does have training on the tent. If I could impeach that officer in the DUI, just as I impeached this officer in this case, and the officer in the DUI eventually says, I just waved the pen back and forth. I don't really know what a nystagmus looks like. I just look at vehicles, and if I can't see in, I just assume that it's illegally tented, even though I have no training on that issue, then I don't need to call a separate expert witness to say what he should be able to do. I've got a witness on the stand that basically says, I have no ability to differentiate between legal and illegal tinted windows at night based on this statute, but I'm going to pull over because I thought 70% of the light had to pass through. For him to mischaracterize that as me, how do you phrase it? He said you tripped him up. Tripping him up. This was not a trip. I was there. I heard what he said. I was shocked. I was anticipating this case going up on appeal. I went back to that, and I put those in the brief in Q&A form so that we would know exactly what he said. This was not a slip of the tongue. The question was, your understanding was that 70% of the light had to pass through, correct? And he says, correct. And that's a lot of light passing through, correct? More than half, correct? Correct. So his thought is that legal is 30. He thinks it has to be 70. That's a 40% gap in what he thinks is legal. And so, to your point, no wonder he thinks that we should be able to see inside of a window. Because what he thinks is legal is 40% off of what is actually legal. Now, we just sort of jumped to this conclusion that this officer is properly trained and that this is simple. When you oversimplify issues, you get – and when you misstate the facts – I mean, this was not an illuminated street. This was a pitch black street. A single candle 100 meters away. Was it really a candle? No, I'm saying – an officer needs to present facts to a judge that says, this officer, based on these facts, based on this training, can reach the reasonable suspicion that there is a violation that has occurred. And then, on these facts, we have an officer who does not have the training, does not have the experience, and is completely wrong about the law. And somehow, it's become my job to bring in an expert witness to testify that this is – I started to go down that road and have the officer testify about what the law is. And the judge said, we don't need to do that. We know the law. And so I – the law is – you know, the law talks about percentages. It says nothing about what you should or shouldn't be able to see through that window under various lighting conditions. And we have no evidence that an officer should or shouldn't be able to see inside of a window under these conditions. The officer has created his own standard. And that's not – that's not what we do. So I have a question. So we understand the officer has some training. We understand the officer has some understanding – some understanding of the law as it exists. When we look at searches in the context and reasonableness of the officer initiating the stop, what effect does mistake of fact of law have on the officer's stop? It differs between mistake of fact and mistake of law. Mistake of fact, if it's a mistake of fact but it's reasonable, then that's no problem. If, for example, I'll come up with a scenario where an officer – Maybe I can even more simplify the question. If we're looking at this for the context of what the officer believed and knew about the statute, if there's a general understanding as to what the statute is, isn't it the case that we have to look at the officer's reasonableness in making that stop? Right. So if the officer knows what the statute says, but he didn't, but if he had, and an officer says, based on my training, that smelled like methamphetamine or anhydrous ammonia. Turns out it didn't. It wasn't anhydrous. It was some other chemical. But when he's in there, he smells Drano. And then he walks in and he sees a murder scene. The officer was wrong, but he had training. And his training sometimes is a mistake, just as the officer might have been trained on legal tenting and illegal tenting, and that's a matter of degree. And he believed that it was – he could have testified, Judge. I've been trained, and on that test, I barely passed it. I was only able to differentiate 66% of the time. And when I've made traffic stops, barely over half of my traffic stops where I thought it was illegal tenting turned out to be illegally tenting. But I was trained under these circumstances. I did my best. I know the statute, and my belief was reasonable. Then we have a very different case. I wouldn't be here. We have an officer that doesn't know the law, using the anhydrous ammonia, has never smelled anhydrous before, but it smells funny. It smells different. And he says, I'm going to go search. We have an officer who has never been trained on whether or not he should or shouldn't be able to see inside of a vehicle at night under these circumstances or anything close to these circumstances. He trained under bright sunlight. And I'm going to say that, first of all, that there is no evidence that these windows were illegally tented. They weren't illegally tented. Counsel, you're actually out of time. Thank you very much. Any rebuttal? Thank you. Counsel, I have a couple questions that I want to make sure you get to. Talk to us about the officer's training and the conditions at the time that this occurred, the lighting conditions. Yeah, so, Counsel correctly points out that the officer, when they were training at the police academy, they looked at a number of different vehicles. But it wasn't early in the day. He testified up to that point. As for the conditions, it was nighttime. I mean, this was in town. So, to describe it as pitch black, I mean, you think of pitch black as, like, out in the country where there's no lights anywhere. This happens in town. I'm not sure about the proximity of street lights or anything, but, again, the officer's sitting in town. So, you know, he says I'm mischaracterizing the record. I think he similarly is actually mischaracterizing the record. He just said pitch black. I just don't think that that's at all accurate. The fact of the matter is, I mean, the officer could be wrong. That doesn't mean that his belief was unreasonable, right? I mean, even if it later proved that the window tint was perfectly legal, that doesn't mean that it was unreasonable for the officer to believe that it was illegal based on his complete inability to see inside the vehicle, when, after all, the purpose of the statute is to ensure that officers can see inside the vehicle. So, the state's not advocating a position where we're trying to remind people anything of the statute. We're talking about a practical, common sense application of this law. And it's not difficult. The officer can see inside the car. The law is intended to ensure that he can. Whether the window tint was, in fact, ultimately legal or illegal is largely irrelevant because what matters is, was the officer's belief reasonable? And do we consider whether or not the officer's belief was reasonable? Do we need to take into consideration the officer's testimony where he was incorrect in what the statute requires? On that point, I have to concede, I'm really not sure. It doesn't make sense to me that it... In my briefing, for example, I use, like, the cannabis example. If an officer observes what appears to be clearly illegal conduct and he later misstates the nuances of the law, I don't think it renders unreasonable that initial suspicion. Essentially, when, as we're dealing with here, it's uncontested. It's just a statement point. There's nothing in this record that suggests that Judge Sherry in any way found this officer incredible or that it wasn't believed that the officer was completely unable to see inside of the car. And the officer did testify after substantial testimony regarding this training that this is a safety issue. Based on his training, when windows are legally tinted, you can see inside. Or at least today in civil law, here, the officer couldn't see anything. Because of that, he reasonably suspected that the window cam was illegal. Does this court have any further questions? I don't see any this time. Thank you, counsel. We'll take this matter under advisement and be in recess.